**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JEROME MCKINNEY, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| v. | )     Civil Action No. 17-1389 |
| | ) |
| UNIVERSITY OF PITTSBURGH, | )     Judge Nora Barry Fischer |
| | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I.    Introduction

This matter involves an alleged retaliation claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.  Specifically, plaintiff Jerome McKinney (hereinafter "plaintiff" or "Dr. McKinney") alleges that his employer, the University of Pittsburgh (hereinafter "defendant" or the "University"), retaliated against him when it internally investigated him for plagiarism.  Dr. McKinney believes that retaliation occurred because he had filed a Title VII discrimination suit against the University approximately two years earlier.  Before the Court is a motion for summary judgment (Doc. No. 26) filed by the University.  For reasons that follow, the motion will be granted.

### II.    Background

This case has a long history dating back to Dr. McKinney's alleged discrimination claims at Civil Action Number 15-1538.  For purposes of this motion, it is unnecessary to re-

summarize all the underlying facts from the previous case.[1]  What follows are the undisputed facts necessary for resolution of the current motion.

Dr. McKinney has worked for the University since 1970.  Doc. No. 28 ¶ 2; Doc. No. 31 ¶ 2.  He is a professor in the Graduate School of Public and International Affairs ("GSPIA"). *Id.*  Dr. McKinney's discrimination claims, along with his current retaliation claim, largely involve John T.S. Keeler, the current Dean of GSPIA.  *See generally* Compl., Doc. No. 3.  Dean Keeler is Dr. McKinney's immediate supervisor.  Doc. No. 28 ¶ 5; Doc. No. 31 ¶ 5.

On August 3, 2013, Dean Keeler advised Dr. McKinney via a written letter that his salary would be reduced by 20 percent due to poor performance.  Doc. No. 28 ¶ 6; Doc. No. 31 ¶ 5; Doc. No. 29-3 at 16–20.  In this letter, Dean Keeler stated that the decision was based on, among other things, poor student evaluations, low student enrollments in Dr. McKinney's courses, and a lack of research and publications.  *See generally* Doc. No. 29-3 at 16–18.  "The bottom line is that you have been attempting to make it appear that you have an active research agenda when there is no evidence to substantiate that claim."  *Id.* at 20.

On September 11, 2013, Dr. McKinney wrote to the Provost for the University, Patricia Beeson, objecting to Dean Keeler's decision to reduce his salary.  At this time, he also alleged that Dean Keeler's actions had been motivated by race and/or age discrimination.  Doc. No. 28 ¶ 7; Doc. No. 31 ¶ 7.  The University conducted an internal investigation, and Dr. McKinney thereafter filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in September 2014.  Doc. No. 28 ¶ 8; Doc. No. 31 ¶ 8.  On November 23, 2015, Dr. McKinney filed a federal lawsuit against the University in this district at Civil

---

[1] For a detailed account of the discrimination suit, see this Court's summary judgment opinion at *McKinney v. Univ. of Pittsburgh*, No. CV 15-1538, 2017 WL 2418689 (W.D. Pa. June 5, 2017).  The opinion is also located on CM/ECF at Docket Number 41.

Action Number 15-1538, alleging that his salary reduction amounted to racial discrimination under Title VII and a violation of his due process rights. *See generally* Doc. No. 1 at 15-CV-1538.

The current retaliation claim involves Dr. McKinney's alleged plagiarized material contained in his book, *Sustainability Budgeting: Imperative for Globalization* (the "book" or "manuscript").[2] At the end of each academic year, faculty within the GSPIA must provide a summary of their achievements, and they provide this summary on a Faculty Activity Report ("FAR"). Doc. No. 3 at 3. Dr. McKinney referenced his book as being "under review" with a publisher in his 2009-10 FAR. Doc. No. 28 ¶ 12; Doc. No. 31 ¶ 12. Dr. McKinney also referenced this book as being under review on his FARs for 2011-12, 2012-13, and 2015-16. Doc. No. 28 ¶¶ 13, 14, 20; Doc. No. 31 ¶¶ 13, 14, 20. Dr. McKinney admits, however, that the first time he submitted the book to any publisher was in 2015. Doc. No. 28 ¶ 16; Doc. No. 31 ¶ 16.

It is undisputed that, on several occasions, Dean Keeler had asked Dr. McKinney for a manuscript of his book given that it was referenced on his FARs. Doc. No. 28 ¶ 17; Doc. No. 31 ¶ 17. Despite claiming that this book was under review with a publisher as early as 2010, Dr. McKinney first submitted a manuscript to the University in March 2016. Doc. No. 28 ¶ 27; Doc. No. 31 ¶ 27. The manuscript was initially submitted in hard copy form to a "Merit Review Committee," and was later provided electronically to Dean Keeler's administrative assistant in May 2016. *See* sources cited *id.* The book was published in 2017. Doc. No. 28 ¶ 26.

---

[2] Dr. McKinney referenced this book as a work in progress on various documents he submitted to the University. In these documents, the book was occasionally referenced under different, though similar, titles.

The parties do not agree on all the investigatory steps which ultimately resulted in the plagiarism allegations. Nevertheless, certain facts are not in dispute. First, Dean Keeler suspected that portions of the book were plagiarized at some point between May 2016 and June 8, 2016. Second, Dean Keeler raised these suspicions to Associate Dean Paul Nelson during that same timeframe. Doc. No. 31 ¶ 33. The University claims that Dean Keeler and Associate Dean Nelson used Google and other software to verify that portions of the book had been plagiarized. Doc. No. 28 ¶¶ 33–36. Dr. McKinney asserts that he has no way of confirming what specific investigatory steps were made. Doc. No. 31 ¶¶ 33–36.

The parties next agree that the University first notified Dr. McKinney of the issues surrounding the manuscript on June 8, 2016. Doc. No. 28 ¶ 38; Doc. No. 31 ¶ 38. The parties were at a court-mandated mediation session for the underlying discrimination case at Civil Action Number 15-1538. The following day, the University sent Dr. McKinney's counsel evidence to support the allegations. *See* sources cited *id.* The parties held the mediation session open for several weeks, but the case did not settle.[3]

On July 8, 2016, Dean Keeler met with the University's Research Integrity Officer, Craig Wilcox. Doc. No. 28 ¶ 46; Doc. No. 31 ¶ 46. The parties dispute the circumstances surrounding the meeting. The University asserts that Dean Keeler met with Mr. Wilcox to explain the reasons for his suspicions, and that Mr. Wilcox later independently verified these suspicions using plagiarism software. Doc. No. 28 ¶ 51. Dr. McKinney claims that he has no way to verify what happened at the meeting or what investigative steps Mr. Wilcox took

---

[3] On June 5, 2017, the Court granted summary judgment in favor of Dr. McKinney on his due process claim. *See McKinney v. Univ. of Pittsburgh*, No. CV 15-1538, 2017 WL 2418689 (W.D. Pa. June 5, 2017). The case is currently on appeal.

following the allegations; Dr. McKinney also claims that the purpose of this meeting was pretext for retaliation.  Doc. No. 31 ¶¶ 48–51.

In early August 2016, Dr. McKinney received written notice from Dean Keeler about an Inquiry Panel that would investigate the plagiarism allegations.  Doc. No. 29-4 at 26–29. The panel would include three members of the University, which is consistent with the University's Research Integrity Policy (the "policy").  Doc. No. 28 ¶¶ 53–54; Doc. No. 31 ¶¶ 53–54; Doc. No. 29-4 at 30.  Specifically, the policy states:

> [T]he dean shall appoint in charge one or more objective, qualified persons (the Inquiry Panel) to conduct the inquiry, in consultation with the Research Integrity Officer . . . They [the panel members] will normally be selected from within the University.  The inquiry shall consist of information-gathering and preliminary fact-finding to determine whether the allegations appear to have substance and are sufficiently founded to warrant a formal investigation.

Doc. No. 29-4 at 34.  The policy further states:

> The dean shall promptly notify the Respondent of the specific allegations and of the initiation of the inquiry and provide the Respondent and the Complainant with a copy of the Research Integrity Policy.  The dean shall provide the Respondent with the names of proposed members of the panel.  If the Respondent objects to the appointment of one or more of the proposed members, he or she shall state the objection(s) in writing to the Provost within 5 days, in which case the Provost shall review the proposed list of members . . . and shall have authority to direct the dean to replace one or more members of the panel.

*Id.* at 35.

The proposed panel included two GSPIA professors.  Doc. No. 29-4 at 20.  Dr. McKinney objected to the panel; he also requested that Dean Keeler be removed, that a new dean be appointed to oversee the process, and that new faculty members be appointed outside of the GSPIA.  Doc. No. 28 ¶ 55; Doc. No. 31 ¶ 55.  The University granted these requests, thereby appointing Dean Gerald Holder of the University's Swanson School of Engineering to oversee the investigation.  Doc. No. 28 ¶ 56–57; Doc. No. 31 ¶ 56–57.  Dean Holder nominated

new members to the Inquiry Panel: Dr. William Chace, Dr. Janelle Greenberg, and Dr. John Markoff.  Doc. No. 28 ¶ 58; Doc. No. 31 ¶ 58.  All three members came from departments outside of the GSPIA.  Dr. McKinney had no objections to the new panel members.  Doc. No. 28 ¶ 59; Doc. No. 31 ¶ 59.

The Inquiry Panel met with Dr. McKinney on December 5, 2016.  Doc. No. 28 ¶ 63; Doc. No. 31 ¶ 63.  Dr. McKinney "did not dispute the evidence, but argued against the misconduct allegation on the basis that it was not appropriate to make such judgment on his work at this stage of his scholarly work in progress."  Doc. No. 29-4 at 47; *see also* Doc. No. 29-2 at 25 (deposition testimony of Dr. McKinney describing the book as a "work in progress").

The University's integrity policy states that "[p]lagiarism *in any scholarly publication* constitutes misconduct."  Doc. No. 29-4 at 32 (emphasis added).  In January 2017, the panel (in a 2-to-1 vote) found that the allegations did not "warrant further formal investigation under the policy."  Doc. No. 29 at 47.  "We agree unanimously that the evidence shows extensive copying of other sources in the draft manuscript." *Id.*  Nevertheless, the panel explained that, "[b]ecause the document central to this allegation of plagiarism is not a scholarly publication and is part of a work in progress, two of the committee's members believe that Dr. McKinney's acts do not constitute Research Misconduct and thus do not warrant further formal investigation." *Id.*  The panel did find, however, that Dr. McKinney committed "Research Impropriety" under the policy, because there was "verbatim copying of the work of other authors" that amounted to a "significant departure from accepted scholarly practice." *Id.*

Plagiarism allegations at the University are relatively uncommon.  Doc. No. 28 ¶ 66; Doc. No. 31 ¶ 66.  The Research Integrity Officer, Mr. Wilcox, claims that there have been six reported incidents of alleged research misconduct since his tenure.  Three of those cases

progressed beyond an Inquiry Panel to a formal investigation. Doc. No. 28 ¶ 67; Doc. No. 31 ¶ 67. The parties do not dispute these figures. *See id.*

Based on the complaint and the records associated with the instant summary judgment motion, it appears that the University took no further action after the Inquiry Panel issued its report. In other words, a formal investigation was never undertaken. Instead, Dean Holder directed Dr. McKinney to "familiarize himself with iThenticate," a software application designed to detect plagiarism. Doc. No. 3 ¶ 34. Dr. McKinney was further instructed to analyze his manuscripts using that software and to submit a report generated by the software to a university representative. *Id.*

On October 17, 2016, Dr. McKinney submitted another charge with the EOCC, this time alleging retaliation under Title VII. *Id.* ¶ 35. He claims that the University – specifically Dean Keeler — retaliated against him by accusing him of plagiarism and that such allegations were aimed at dissuading him from pursuing his underlying discrimination claim against the University. *See generally* Doc. No. 3. The instant suit was filed on October 26, 2017. The University has now moved for summary judgment. Doc. No. 26. The motion has been fully briefed (see Doc. Nos. 27–32) and is ripe for disposition.

## III. Jurisdiction

The Court exercises subject matter jurisdiction under 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## VI.    Standard of review

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute of material fact is one that could affect the outcome of litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue in rebuttal. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). When considering the parties' arguments, the Court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  The benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v.*

*New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)).   The non-moving party must resort to affidavits, deposition testimony, admissions, and/or interrogatory answers to demonstrate the existence of a genuine issue.  *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).

## IV.    Discussion

The Court now turns to the instant motion for summary judgment.  To survive summary judgment, Dr. McKinney must show a *prima facie* case of retaliation under Title VII and the existence of genuine, triable issues.  The Court finds that Dr. McKinney's claims fall short of both hurdles.

## A.    The legal framework for retaliation claims

Title VII provides protection against retaliation for those who participate in EEO procedures or oppose discrimination.  The Act provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).  To establish a *prima facie* case of retaliation, a plaintiff must tender evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.  *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

Title VII retaliation claims are analyzed under the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 804 (1973): (1) first, the plaintiff must establish a *prima facie* case of retaliation; (2) then, the burden shifts to the employer to advance a legitimate, non-retaliatory reason for the adverse employment action; (3) and finally, the plaintiff is afforded an opportunity to show that the employer's proffered reason was a pretext for retaliation. *Moore*, 461 F.3d at 331. With respect to the third prong, to survive summary judgment, the plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

Finally, the Court must analyze the *McDonnell Douglas* framework using the totality of the circumstances. *Moore*, 461 F.3d at 346. "[A]s a play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Id.* (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1484 (3d Cir. 1990)).

With this framework in mind, the Court will now explain why summary judgment must be granted.

### B.      Dr. McKinney has not established an adverse employment action

First, Dr. McKinney fails to establish a *prima facie* case of retaliation because he points to no evidence that would show an adverse employment action.[4]

---

[4] Neither party raises this issue in their briefing. Both parties simply assume that Dr. McKinney can show an adverse employment action. Doc. No. 27 at 3; Doc. No. 30 at 3. The Court cannot agree. Rather than prolong

The Supreme Court set forth the standard for an "adverse employment action" in *Burlington Northern*. The Court held that a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). The Court further explained that "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that *produces an injury or harm*." *Id.* at 67 (emphasis added). "We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth a general civility code for the American workplace." *Id.* (internal quotation marks and citation omitted).

In *Burlington Northern*, the Court also explained that the standard for "materially adverse" is an objective one. And it is flexible:

> Context matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. . . A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. . . A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. . . . Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an act that would be immaterial in some situations is material in others.

the resolution of this case, the Court will not order additional briefing and, instead, will decide the case on the merits based on the written evidence and documents currently before it. This is appropriate because the issue is purely legal, the record is fully developed, and the plaintiff will not suffer prejudice. *Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 224 (3d Cir. 2004). To that end, Dr. McKinney was given the opportunity to fully present his evidence (e.g., evidence of a cognizable harm would help him meet his burden in establishing pretext, as discussed *infra* in Part VI(C)), and thus any lack of notice here would not cause prejudice. Furthermore, there is a separate basis to grant summary judgment — plaintiff has not shown pretext. Additional briefing, therefore, would not afford plaintiff an opportunity to survive judgment.

*Id.* at 69 (internal quotations omitted).

In view of this standard, courts generally hold that an internal investigation does not constitute an adverse employment action for Title VII retaliation purposes unless it results in discipline or some other cognizable injury. *See Ham-Jones v. United Airlines, Inc*., No. 4:11-CV-2008 CDP, 2012 WL 4358004, at *4 (E.D. Mo. Sept. 24, 2012) ("It is well-established in this Circuit that an internal investigation—even if it leads to a recommendation of discharge—cannot constitute a materially adverse employment action unless it results in discipline.") (collecting cases); *Lewis v. State of Connecticut Dep't of Corr*., 355 F. Supp. 2d 607, 619 (D. Conn. 2005) (same); *see also Lakkis v. Lahovski*, 994 F. Supp. 2d 624, 633 (M.D. Pa. 2014) (discussed in First Amendment retaliation context); *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir.2001) (holding that "placing [an employee] on administrative leave with pay for a short time to allow investigation" is not an adverse action for retaliation purposes), abrogated on other grounds by *Burlington*, 548 U.S. at 60; *Jones v. Se. Pa. Transp. Auth*., 796 F.3d 323, 326 (3d Cir. 2015) ("A paid suspension pending an investigation of an employee's alleged wrongdoing does not fall under any of the forms of adverse action mentioned by Title VII's substantive provision.").

Moreover, not every employee grievance serves as an adverse employment action. *See, e.g., Ashton v. SCI-Fayette, Pennsylvania Dep't of Corr*., No. CV 16-1795, 2018 WL 2966849, at *6 (W.D. Pa. June 13, 2018) (Fischer, J.) (finding, among other things, that increased scrutiny at work does not rise to level of material adversity) (collecting cases); *Brown v. Advocate S. Suburban Hos*p., 700 F.3d 1101, 1107–08 (7th Cir. 2012) (directing "relatively mild epithets" at plaintiffs, including "troublemaker," "cry-baby," and "spoiled child," would not dissuade a

reasonable person from filing a claim, even assuming such epithets concerned plaintiffs' prior protected activity); *Bhatti v. Trustees of Boston Univ.*, 659 F.3d 64, 73 (1st Cir. 2011) (written reprimands, even if undeserved, had no "tangible consequences" and were merely directed at "correcting some workplace behavior that management perceived as needing correction"); *Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008 ) (lower performance ratings were not actionable unless accompanied by "tangible job consequences").

After substantial case research, and in view of the *Burlington* standard, the Court finds that Dr. McKinney has not claimed any conduct that would constitute an adverse employment action because there has been no tangible harm.

In his complaint, Dr. McKinney states:

> As an academic, Dean Keeler knew, or should have known, the severe consequences that a charge of plagiarism *could* have for the Plaintiff.
>
> * * *
>
> Plaintiff believes, and therefore of theirs, that a *potentially career ruining charge* of plagiarism would dissuade a reasonable professor from pursuing his charges of discrimination.

Doc. No. 3–4 at ¶¶ 54, 56 (emphasis added). Certainly, allegations of plagiarism can have *potentially* significant consequences. But, potential harm is not the standard. Rather, Dr. McKinney must point to retaliatory conduct that produced an actual injury. *Burlington*, 548 U.S. at 67; *see also Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1030 (7th Cir. 2004) ("It is well established that unfulfilled threats that result in no material harm cannot be considered an adverse employment action under Title VII."); *cf. Szeinbach v. Ohio St. Univ.*, 493 F. App'x 690 (6th Cir. 2012) (accusations of misconduct in plaintiff's research constituted an adverse action where colleague contacted the editors of journals that had published the plaintiff's works and

broadcast his accusations via e-mail to the faculty and to prominent researchers in plaintiff's field).

The record has now been fully developed. Although the parties dispute Dean Keeler's *intent* when pursuing the plagiarism allegations, they do not dispute the basic events that transpired. As discussed above in Part II, with full citations to the record:

- Dean Keeler had repeatedly asked for a copy of the manuscript at issue;

- Dr. McKinney eventually provided Dean Keeler with a manuscript in electronic format in May 2016;

- Dean Keeler suspected that portions of the manuscript had been plagiarized, and he raised those suspicions to Associate Dean Nelson sometime between May 2016 and June 8, 2016;

- The University notified Dr. McKinney of the allegations on June 8, 2016, at a court-ordered mediation session;

- The following day, the University provided Dr. McKinney's counsel with supporting evidence via email;

- In early August 2016, Dr. McKinney received written notice about an informal investigation (the Inquiry Panel) that would determine whether there was sufficient evidence to warrant a formal investigation;

- Dr. McKinney wrote a letter to the Provost, objecting to the proposed panel and to Dean Keeler being involved in the process;

- The University appointed a new dean and three new panel members, all of whom were outside the GSPIA;

- Dr. McKinney met with the Inquiry Panel on one occasion in December 2016;

- Dr. McKinney did not dispute the evidence against him, but argued that it did not constitute plagiarism under the relevant policy;

- About a month later, the Inquiry Panel issued its report;

- The Inquiry Panel agreed with Dr. McKinney that he did not commit plagiarism under the relevant policy;

- Dean Holder then directed Dr. McKinney to familiarize himself with plagiarism software and to use the software to analyze his manuscripts;

- The informal investigation was closed; and

- Dr. McKinney published his book in 2017.

Based on these undisputed facts, a reasonable jury could not find any tangible harm. As Dr. McKinney concedes, there was never a formal investigation. As the relevant policy noted, the informal inquiry process was completely confidential.[5] Dr. McKinney has never alleged, nor has the evidence showed, that the allegations resulted in any harm to his professional reputation. Furthermore, Dr. McKinney was never disciplined as a result of the investigation. He did not lose any pay or benefits; he was not placed on administrative leave; he was not given any significantly different job duties; and there is no evidence that his position as a faculty member changed in any way. There was also no impact on his professional achievement, and his book was ultimately published. Accordingly, the internal investigation did not amount to an adverse employment action.

The Court's holding aligns with those cases where, as a general rule, an internal investigation does not constitute an adverse employment action for Title VII retaliation

---

[5] The Court notes that the only reason this matter is now in a public forum is because Dr. McKinney filed the instant lawsuit.

purposes unless it result in discipline. *See* cases cited *supra*. Furthermore, this Court has heeded *Burlington's* guidance to consider "materially adverse" under the totality of the circumstances. To that end, the Court has carefully reviewed the alleged conduct under the circumstances of this case, and it does not find any materially adverse employment action.

To the extent Dr. McKinney complains about the quality of the investigation, the steps he took to defend himself during the informal investigation (e.g., writing to the Provost and later meeting with the Inquiry Panel on one occasion), and his allegation that he was later asked to analyze his manuscripts using plagiarism software, the Court finds that each of these complaints are trivial harms that would not dissuade a reasonable worker from making a discrimination charge.

Finally, to the extent Dr. McKinney argues that the plagiarism allegations were an attempt to pressure him to drop his prior discrimination suit, the Court again finds that this is not a cognizable injury as a matter of law. *See Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 697 (7th Cir. 2017) (holding that superior's alleged act of pressuring professor to drop discrimination charges and unfulfilled threats of discipline did not amount to materially adverse action as would support Title VII retaliation claim).

For these reasons, there is no genuine factual dispute, and the University is entitled to judgment as a matter of law as it relates to the "adverse employment action" element that is necessary to sustain a cause of action for retaliation under Title VII.

**C.    A jury could not reasonably find pretext under the instant set of facts**

Even if Dr. McKinney could meet his burden in showing an adverse employment action, his claim fails because a reasonable jury could not conclude that he has provided sufficient evidence of pretext.

As discussed above, if the employee establishes a *prima facie* case of retaliation, "the familiar *McDonnell Douglas* approach applies in which the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct." *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006) "(quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997)). If the employer does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.*   In other words, the plaintiff must show that the employer's proffered reason was a pretext for retaliation. *Ashton v. SCI-Fayette, Pennsylvania Dep't of Corr.*, No. CV 16-1795, 2018 WL 2966849, at *4 (W.D. Pa. June 13, 2018) (Fischer, J.).

Here, the University has met its burden in advancing a legitimate, non-retaliatory reason for its conduct. Undoubtedly, the University has an interest in ensuring that its faculty members do not plagiarize. As its integrity guidelines state: "Not only does plagiarism violate the standard code of conduct governing all researchers, but in many cases it could constitute an infraction of the law by infringing on a copyright held by the original author or publisher." Doc. No. 29-4 at 24 ¶ 1. Moreover, Dr. McKinney represented on his 2009-10, 2011-12, 2012-13, and 2015-16 FARs that his book was "under review" with publishers. Doc. No. 28 ¶ 16; Doc. No. 31 ¶ 16. In other words, at the time Dean Keeler secured a copy of the manuscript in May 2016, he had every reason to believe that Dr. McKinney had already submitted his book to

publishers for publication. Furthermore, according to the University's policy, Dean Keeler had an obligation to report "suspicions or evidence" of research misconduct. Doc. No. 29-4 at 30–31. Research misconduct includes plagiarism: that is, "the appropriation of another person's ideas, processes, results, or words without giving appropriate credit." *Id.* at 32. Dr. McKinney has never disputed that his book included source material without proper attribution. *Id.* at 47. Rather, he claims that his actions did not amount to research misconduct because his book was not yet published. *Id.* Regardless of whether Dr. McKinney violated the policy, a reasonable jury would have to conclude, based on the evidence, that the University has advanced a nondiscriminatory reason for its conduct.

The burden thus shifts back to Dr. McKinney to show pretext. To defeat summary judgment at the pretext stage, Dr. McKinney must point to some evidence from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

### 1. Dr. McKinney has not discredited the University's proffered reason.

First, Dr. McKinney could defeat summary judgment by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* at 765 (internal quotations and citations omitted). Nevertheless, to discredit the employer's proffered reason, the plaintiff must do more than show that the conduct was unwarranted. "[T]he plaintiff cannot simply show that the employer's decision was wrong or

mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.*

Here, Dr. McKinney has done little to cast doubt on the University's articulated reasons such that a rational factfinder would reject them. It cannot be said that the accusations/investigation was a witch hunt or some *post hoc* fabrication — Dr. McKinney himself did not dispute the evidence against him, which showed verbatim copying of the works of others in his manuscript. In his complaint, Dr. McKinney stated that "Dean Keeler knew, or should have known, that an unpublished rough draft, submitted to him at his own request, did not constitute 'scholarly publication.'" Doc. No. 3 at 8 ¶ 55. But, the facts bore out differently. It is undisputed that Dr. McKinney submitted his manuscript to publishers, and that Dean Keeler would have known of this based on the FAR submissions. There is no evidence in the record, and indeed nothing from the University's plagiarism policy, which would suggest that Dean Keeler did not have a reasonable basis to report the allegations. Although the investigation was ultimately decided in Dr. McKinney's favor, that does not discredit the University's proffered reasons for its conduct. *See Fuentes*, 32 F.3d at 765 (a plaintiff cannot simply show that the employer's decision was wrong or mistaken).

**2. Dr. McKinney cannot show that a discriminatory reason was more likely than not a motivating factor in the University's conduct.**

Dr. McKinney could also avoid summary judgment by coming forward with sufficient evidence "from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision." *See id.* at 765. Pretext can be shown this way by producing evidence that (1) the employer

previously has retaliated against the plaintiff; (2) the employer has retaliated against other persons; or (3) the employer has treated more favorably similarly situated employees who did not engage in the protected activity at issue. *See Ashton v. SCI-Fayette, Pennsylvania Dep't of Corr.*, No. CV 16-1795, 2018 WL 2966849, at *9 (W.D. Pa. June 13, 2018) (citing *Fuentes*, 32 F.3d at 765). In addition, the following factors are relevant to this inquiry: the defendant's credibility, the timing of events giving rise to the improper motivation, and the employer's overall treatment of the employee (e.g., when the employer responds in a manner that appears unduly harsh or inappropriate under the circumstances). *See Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638–39 (3d Cir. 1993); *Fuentes*, 32 F.3d at 766.

Dr. McKinney has not argued or presented evidence in this case that the University has previously retaliated against him or others, nor has he shown that the University treated more favorably similarly situated employees who have not raised Title VII claims. To the contrary, there have been at least six reported incidents of research misconduct since Mr. Wilcox has taken office; in at least three of those cases, the allegations progressed past the Inquiry Panel to a formal investigation. Doc. No. 28 ¶ 67; Doc. No. 31 ¶ 67. In other words, in half of the other research misconduct cases, individuals were treated more severely than Dr. McKinney.

In his brief opposing summary judgment, Dr. McKinney argues that pretext can be inferred based on alleged defects in the investigation and the suspicious timeline for Dean Keeler's reporting. Doc. No. 30 at 5–11. These are appropriate factors to consider when determining whether an inference of pretext can be made. Nevertheless, they are unpersuasive here.

Regarding defects in the investigation, Dr. McKinney points to evidence that Dr. Keeler appointed two prospective panel members who belonged to the GSPIA. Dr. McKinney claims

that these appointments were inappropriate because Dr. Keeler is the direct supervisor to GSPIA faculty members. Doc. No. 30 at 7. Dr. McKinney also notes a discrepancy in the August 2016 letter: "A letter signed by Dean Keeler was . . . sent to the Plaintiff to inform him that Dean Keeler had '***received*** allegations of plagiarism on [Plaintiff's] part,' even though Dean Keeler was actually the individual who ***made*** the accusations." *Id*. (emphasis in original).

A reasonable jury could not find that this evidence raises an inference of retaliation.

First, the University policy provides that the "dean shall appoint in charge one or more objective, qualified persons (the Inquiry Panel) to conduct the inquiry . . . [t]hey will normally be selected from within the University." Doc. No. 29-4 at 35. According to the policy, therefore, there was nothing improper about Dean Keeler appointing two professors from the GSPIA. Moreover, Dr. McKinney points to no evidence that these proposed panel members would have any actual bias against him. In fact, there is no evidence suggesting that the panel members had any reason to know of the animosity between Dean Keeler and Dr. McKinney or of the discrimination suit against the University.

Second, to the extent the August 2016 letter did not specify that Dean Keeler was the person who initially suspected Dr. McKinney of plagiarism, this grievance is either "unfounded or too petty to serve as evidence of retaliation." *Jones v. Se. Pa. Transp. Auth*., 796 F.3d 323, 330 (3d Cir. 2015) (holding that numerous alleged defects in investigation was not evidence of retaliation). Mr. Wilcox, the Research Integrity Officer, conducted his own inquiry prior to the August 2016 letter. Doc. No. 30-4 at 6. It is reasonable to conclude that Dean Keeler was alluding to Mr. Wilcox's inquiry when he stated that he had received accusations of plagiarism. Even if Dean Keeler intentionally misrepresented the identity of Dr. McKinney's accuser in his letter, it had no bearing on the outcome of the investigation. Ultimately, an independent panel

— and not Dean Keeler — would determine whether the allegations had substance. The letter, in effect, did not prejudice Dr. McKinney, nor did it affect his ability to defend himself. *Jones v. SEPTA*, No. 12-CV-6582-WY, 2014 WL 3887747, at *12 (E.D. Pa. Aug. 7, 2014), aff'd sub nom. *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323 (3d Cir. 2015) (reasoning that alleged defects in investigation did not prejudice plaintiff in mounting a proper defense). In other words, given that the letter had little to no bearing in the investigation, a reasonable jury could not conclude that defects in the letter amounted to a bad faith investigation.[6]

Dr. McKinney also claims that pretext can be inferred based on "multiple timeline issues with regards to [the University's] investigation, specifically the presentation of evidence at his mediation, and the subsequent decision to wait to determine whether the discrimination suit would be settled at mediation before proceeding with plagiarism charges." Doc. No. 30 at 10. Dr. McKinney argues that Dean Keeler suspected plagiarism in May 2016, yet he waited two weeks to first notify Dr. McKinney (i.e., at the June 8, 2016 mediation session related to his discrimination suit). Doc. No. 30 at 5. He further argues that Dean Keeler then waited a few weeks to report the allegations to Mr. Wilcox and only after it became apparent that the discrimination suit would not be settle. *Id.* at 6. "The clear implication . . . is that [the University] was prepared to forgo any plagiarism claims had settlement been able to be reached in the related case." *Id.* at 8.

The record once again does not support an inference of pretext based on the timeline of events. Contrary to Dr. McKinney's arguments, Dean Keeler initially met with Associate Dean

---

[6] The Inquiry Panel included the written notice to Dr. McKinney as part of its final report. See Doc. No. 29-4 at 50. To that end, the fact that the identity of the accuser was anonymous likely added greater fairness to the process. Once again, the fact that Dean Keeler did not identify himself as the accuser in the letter does not suggest prejudice or any inference of pretext.

Nelson to report the plagiarism allegations at some point *before* the mediation session. Doc. No. 31 ¶ 33. Moreover, Dean Keeler had asked for a copy of Dr. McKinney's manuscripts well before the underlying discrimination suit had even started, and Dr. McKinney eventually provided an electronic copy of the manuscript at issue in May 2016. Doc. No. 28 ¶ 27; Doc. No. 31 ¶ 27. Nothing about this timeline is suspicious.

Next, as for the alleged delay in the investigative process, the University contends that the plagiarism issue would have been moot had Dr. McKinney accepted any settlement proposal from the University. The Court is reluctant to get involved in confidential settlement negotiations[7]; nevertheless, the University's explanation is reasonable. If anything, a reasonable jury could conclude that the University was acting in Dr. McKinney's best interests by delaying a more formal investigation into the plagiarism allegations given that the issue might have become moot. Furthermore, the delay between the initial suspicions and the initiation of the Inquiry Panel was hardly significant. This Court cannot conclude that a delay of several weeks between initial suspicions of plagiarism — which Dr. McKinney concedes is a serious accusation — and Dr. McKinney's formal notice of the investigatory process, gives rise to an inference of pretext.

Put simply, by all accounts the record shows that the University behaved appropriately under the circumstances. Dean Keeler initially suspected plagiarism, and he sought the guidance of Associate Dean Nelson. He then sought guidance from the Research Integrity Officer, Mr. Wilcox. The University initially informed Dr. McKinney of the accusations in a

---

[7] Indeed, this Court has previously commented on "the time honored principle that settlement discussions generally remain confidential." *E.E.O.C. v. U.S. Steel Corp.*, 877 F. Supp. 2d 278, 293 (W.D. Pa. 2012); *see also* U.S. DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA, ADR POLICIES AND PROCEDURES (effective Feb. 1, 2012), available at https://www.pawd.uscourts.gov/sites/pawd/files/ADRPolicies.pdf; 28 U.S.C. § 652(d).

confidential setting.  Dean Keeler and Mr. Wilcox then followed the University policy by notifying Dr. McKinney in writing that an Inquiry Panel would investigate the accusations.  The University then granted Dr. McKinney's request to have a new dean appointed; the newly appointed dean nominated three new panel members who were faculty members outside the GSPIA.  Dr. McKinney had no objection to the new panel.  The University timely investigated, in a confidential manner, and it ruled in Dr. McKinney's favor shortly thereafter.  Nevertheless, the investigation showed that Dr. McKinney had included verbatim portions of other authors' works in his book, and they found that this conduct amounted to a significant departure from accepted practice.  Even so, the investigation ended, and Dr. McKinney suffered no adverse consequences.  His book was published, and he remains a professor at the University.

When viewing the record in the light most favorable to plaintiff, the Court finds that a reasonable jury could not conclude that a discriminatory reason was more likely than not a motivating cause of the University's action.  The University had every right to investigate suspicions of plagiarism by one of its professors.  It cannot be true that the University was without the ability to investigate these legitimate concerns simply because Dr. McKinney had previously filed a discrimination lawsuit.

**V.      Conclusion**

For the reasons stated herein, the University has shown that it is entitled to summary judgment on the motion and the retaliation claim.  An appropriate order follows.

> _s/Nora Barry Fischer_
> Nora Barry Fischer
> U.S. District Judge

Dated: December 17, 2018

cc/ecf:  All counsel of record.